## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**DEBORAH ANN CALHOUN,**

      **Plaintiff,**

**v.**                                **Case No.: 3:10-cv-00087**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

      **Defendant.**

### MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 2). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 8 and 9). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 14, 15, and 16).

## I.   Procedural History

Plaintiff, Deborah Ann Calhoun (hereinafter "Claimant"), applied for DIB benefits on April 27, 2007, alleging disability beginning June 30, 2004 due to carpel tunnel in her right wrist; pain in her shoulder, neck, lower back and right knee; a cyst on her left wrist; headaches; acid reflux; and "nerves." (Tr. at 93-95 and 110). The application was denied initially and upon reconsideration. (Tr. at 47-51 and 54-56). Thereafter, Claimant

requested an administrative hearing, which was held on February 6, 2009 before the Honorable Charlie Paul Andrus, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 22-44). By decision dated May 11, 2009, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 9-21).

The ALJ's decision became the final decision of the Commissioner on December 14, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-4). On January 28, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, both parties have filed their Briefs in Support of Judgment on the Pleadings, and Claimant has filed a Response in Opposition to the Commissioner's brief. (Docket Nos. 11, 12, 15, 16). Therefore, the case is ripe for resolution.

## II.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a

severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable

mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through December 31, 2009. (Tr. at 11, Finding No. 1).  The ALJ found that Claimant satisfied the first step of the sequential evaluation because she had not engaged in substantial gainful activity since the date of the alleged onset of disability. (*Id.* at Finding No. 2). The ALJ noted that Claimant worked for two days as a security guard in 2006, earning $43.78, after her alleged onset date, but the ALJ found that she did not work long enough or earn enough money for it to be considered substantial gainful activity or an unsuccessful

work attempt. (*Id.*). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of degenerative joint disease and depression. (*Id.* at Finding No. 3). He further determined that Claimant had non-severe impairments of carpel tunnel syndrome in her right wrist, a cyst on her left wrist, acid reflux, and headaches. (*Id.*). Nonetheless, at the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 13, Finding No. 4). The ALJ then found that Claimant had the following residual functional capacity (hereinafter "RFC"):

> [L]ight work as defined in 20 C.F.R. 404.1567(b) except she can never climb ladders, or kneel and she can only occasionally climb stairs, balance, stoop, crouch or crawl. She is limited to only occasionally reaching overhead and no constant use of her right hand for strong grip. She is to eliminate work at temperature extremes subjecting her body to vibration at heights or around dangerous machinery. The claimant is limited to more simple routine work in a low pressure setting with limited social interaction with supervisors, coworkers and the public.

(Tr. at 15, Finding No. 5).

As a result, Claimant could not return to her past relevant employment as a deli cook (medium exertional level and semi-skilled), a sewing laborer (light exertional level and unskilled), or a security guard (light exertional level and semi-skilled). (Tr. at 19, Finding No. 6). The ALJ considered that Claimant was 46 years old at the time of the disability onset date, which defined her as a "younger individual age 18-49," and that she had a high school education and could communicate in English. (*Id.*, Finding Nos. 7 and 8). The ALJ noted that transferability of skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Claimant had transferable job skills. (*Id.*, Finding No. 9). In view of these factors and based on the evidence of record and the vocational expert's testimony, the ALJ

concluded that Claimant could perform light-level jobs such as price marker, office helper, and inspector and sedentary-level jobs such as routing clerk, grader/sorter, and assembler (Tr. at 19-20, Finding No. 10). On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act.  (Tr. at 20, Finding No. 11).

## III.   <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).  The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*  The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind

that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record reveals that the decision of the Commissioner is supported by substantial evidence.

## IV.    <u>Claimant's Background</u>

Claimant was born in 1958 and was 51 years old at the time of her administrative hearing. (Tr. at 26). She confirmed that she was a high school graduate and could speak and read English. (Tr. at 27 and 109). In the fifteen years preceding her alleged onset of disability, Claimant was employed as a deli cook, sewing laborer at a bedding factory, and a security guard at a Toyota plant. (Tr. at 24).  She ceased working after suffering injuries in a fall at the Toyota plant. (Tr. at 28).

## V.    <u>Relevant Medical Evidence</u>

The Court reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence.   To the extent that the Claimant's medical treatment and evaluations are relevant to the issues in dispute, the Court summarizes them as follows:

### A. Pre-Onset Records

The record establishes that Claimant saw Anita T. Dawson, D.O., for many years before and after her alleged onset of disability; the first visit included in the file was on January 23, 1995 and Claimant continued to see Dr. Dawson on a monthly to bi-monthly basis, occasionally seeing her twice per month, through August 25, 2008. (Tr. at 373-458 and 522-527). Dr. Dawson's handwritten notes relate that Claimant initially complained of only headaches, for which she was prescribed Darvocet, but over the course of treatment, Claimant began to complain of allergies; sinus problems; a

cough/cold; anxiety; the need to lose weight; anxiety/"nerves;" arthritis; and back, leg, neck, right knee, and right shoulder pain. For these issues, Dr. Dawson prescribed additional medications including Valium, Imitrex, and Adipex. In addition, Dr. Dawson began prescribing Lorcet to Claimant on approximately May 21, 2003 and added Percocet to Claimant's medication regimen 1n May, 2005. (Tr. at 406 and 393). On August 28, 2008, Claimant's final visit with Dr. Dawson in the record, Claimant was prescribed Percocet, Lorcet, Valium, Phenegra, and Nexium. (Tr. at 522).

On January 18, 1996, Claimant was seen at Scott Orthopedic Center, complaining of pain in her left wrist that she stated lasted for the past six months. (Tr. at 613-614). She related that she fell "probably before that" and that the pain in her left hand, which was reportedly her dominant hand, affected her position as a sewer at Imperial Bedding. (*Id.*).[1]

On February 1, 1996, Claimant was again seen at Scott Orthopedic Center, stating that her left wrist was "better." (Tr. at 610). A CAT scan showed a small cyst in the navicular, which may relate to degenerative changes; however, the periarticular structures were well preserved. (*Id.*). She now complained of right low back pain with some posterior thigh radiation. (*Id.*). She stated that she had numbness in her legs down to her knees, but not below; that her back hurt with standing, sitting, and walking; and she sometimes applied ice in the morning which was helpful. (*Id.*). X-rays showed no obvious low back or neck pathology. (Tr. at 611). She was instructed in exercises for her neck and low back and encouraged to use Aleve periodically for her wrist. (*Id.*).

In June 2003, Claimant reported a work-related sprain to her right knee and elected to undergo arthroscopic ACL reconstruction surgery. On July 24, 2008, James

---

[1] Claimant stated throughout the remainder of her medical history that her right hand was dominant.

B. Cox, D.O., performed the surgery at Putnam General, without complication. (Tr. at 528).[2]

On January 14, 2004, Claimant presented at the Putnam General Hospital Emergency Room, complaining that she was experiencing dull pain in her right shoulder after falling on ice. (Tr. at 497 and 499). She was seen by Kelly Cummings, PA-C (Physician's Assistant-Certified); Greg Kelly, D.O., reviewed and affirmed the history, physical examination, diagnostic tests, and treatment plan. (Tr. at 498). She stated that she had an "old Workers' Compensation injury" and that she was waiting for Workers' Compensation to pay for the surgery, which was to be performed by Dr. Cox. (Tr. at 497). She further stated that she was "off work" for a period of time in 2003, but returned to work in October 2003 and that she was mostly a supervisor and did little manual labor; however, over the past two weeks, she did "a lot of lifting and overhead work" and felt like she aggravated her right shoulder. (*Id.*). On examination, her shoulder had good range of motion upon flexion and extension, but abduction and external rotation were very difficult due to pain; she had good strength resistance of 4/5 in her right upper extremity; and she denied any pain radiating into her arm or hand. (*Id.*). Her current medications were Premarin and Lorcet. (*Id.*). An x-ray of her right shoulder revealed no fracture or dislocation. (Tr. at 498). She was diagnosed with a musculoskeletal strain and bone spur in her right shoulder. (*Id.*). She was prescribed Toradol 60 mg IM, given a sling, advised to rest and ice her shoulder, taken off work for seven days, and advised to take the Lorcet that she was currently prescribed as needed for pain and to follow up with Dr. Cox in one or two days or return to the clinic if her

---

[2] This surgery is incorrectly reflected in many of the medical records as occurring on March 3, 2003 per Claimant's report. (*See, e.g.*, Tr. at 199, 206, and 276). Claimant also reports undergoing an arthroscopic knee surgery in 2001. (Tr. at 199).

condition worsened. (*Id.*).

### B. Alleged Onset of Disability and Post-onset Records

Claimant reports that she became disabled on June 30, 2004 when she was injured while working as a security guard. (*See* Tr. at 199). She states that as she was climbing out the cab of a semi-truck, which she was searching as part of her duties, her foot "got hung on a step" and she fell backward, twisting her right knee and grabbing with her right hand to keep from falling, which she states violently jerked her right upper extremity, especially her right shoulder. (*Id.*).

The day after her injury, on July 1, 2004, T. Donald Sommerville, M.D. examined Claimant for her complaints of shoulder and right knee pain. (Tr. at 247). He assessed that she had right shoulder and knee sprains and treated her conservatively, suggesting that she take Advil, ice the affected areas, and not work until July 6, 2004 when she should return to his office for reevaluation. (*Id.*).

On July 6, 2004, Claimant returned to Dr. Sommerville's office and was seen by Dr. Sommerville's colleague, Myron A. Lewis, M.D. (Tr. at 246). Claimant complained that she continued to have pain in the medial aspect of her right knee, was unable to ambulate without pain, and was having difficulty climbing steps. (*Id.*). Dr. Lewis noted that his evaluation of her right knee revealed good knee stability and no joint effusion, but she was tender to palpitation along the medial joint line. (*Id.*). He assessed that she suffered from right knee pain which was possibly caused by a meniscus injury. (*Id.*). Dr. Lewis referred Claimant to Scott Orthopedics for further evaluation and extended her leave of absence from work until July 14, 2004. (*Id.*). Dr. Lewis did not note any complaints or findings regarding Claimant's shoulder. (*Id.*).

On July 7, 2004, Kyle R. Hegg, M.D., consulted with Claimant concerning her work injury. (Tr. at 600). The x-rays showed that Claimant had some mild symmetrical medial joint space narrowing which could be normal for her; there was no sign of fracture or other issues. (Tr. at 601). Dr. Hegg suspected that she had some type of contusion/chondromalacia; he advised her that treatment for this condition consisted of nonsteroidal medications, physical therapy, modification of activities, and long-term weight loss. (Tr. at 602). He stated that she could return to work when she could tolerate the amount of walking and climbing that was required and that physical therapy could assist her with achieving that goal. (*Id.*).

On August 11, 2004, Claimant advised Dr. Hegg that her knee still bothered her, although it had somewhat improved. (Tr. at 597). She reported that she was unable to go to physical therapy because it was not yet authorized due to a Workers' Compensation "paperwork situation." (*Id.*). She was reexamined and her knee had slight hyperextension, flexion of about 145 or 150, good stability, no effusion, mild patellofemoral crepitus, and her "McMurray's" seemed unremarkable in each compartment. (*Id.*). Dr. Hegg reiterated that she needed to be involved in physical therapy and that she should use her stationary bicycle while Workers' Compensation authorization was pending with the goal being comfortable enough to resume working. (*Id.*).

On August 12, 2004, Dr. Sommerville noted that Claimant continued to have right knee pain for which she saw Dr. Hegg, who advised physical therapy. (Tr. at 245). She also complained of continued shoulder pain when lifting her arm above horizontal for which she used Advil and heat without much response. (*Id.*). She had no upper extremity weakness or numbness, no point tenderness, and full upper extremity motor

strength, but she had decreased range of motion of her right shoulder secondary to pain and moderate diffuse tenderness. (*Id.*). She walked with a slight limp and had pain with manipulation, but there was no effusion and good AP valgus and varus stability. (*Id.*). Dr. Sommerville referred Claimant to orthopedics for her right shoulder pain per her request and prescribed Naprosyn, 500 milligrams, as needed. (*Id.*).

On August 25, 2004, Dr. Sommerville referred Claimant to Stanley S. Tao, M.D. (Tr. at 586). Dr. Tao noted that x-rays of Claimant's right shoulder were normal and assessed her with cervical strain and right peri-trapezial shoulder pain. (*Id.*). He stated that he did not believe that her shoulder was the "problem," but rather, that she had a cervical sprain for which she only needed time, therapy, and Naprosyn. (*Id.*).

On September 9, 2004, Dr. Sommerville referred Claimant for an x-ray of her cervical spine to evaluate her neck and right arm pain. (Tr. at 244). There was no acute fracture or dislocation and the disc space heights were preserved. (*Id.*). There was some facet hypertrophy which appeared to cause some impingement of the right C3-4 neural foramen and some nerve root impingement could occur as a result of this finding. (*Id.*). The remaining neural foramina were patent and no other focal bony lesions were apparent. (*Id.*). On September 27, 2004, a follow-up MRI was taken of Claimant's cervical spine. (Tr. at 220). She had a small disc protrusion posterior centrally at C3-C4 and C4-C5, as seen on the sagittal images and a right posterior paracentral small disc protrusion versus extrusion at C6-C7. (*Id.*).

On October 4, 2004, Dr. Tao noted that physical therapy improved Claimant's symptoms by 30 percent.[3]  He reviewed the recent MRI, noting the disc protrusions at

---

[3] Claimant was referred to Teays Physical Therapy Center and participated in fourteen physical therapy sessions from September 24, 2004 through November 10, 2004. (Tr. at 537 and 536).

C3-C4, C4-C5, and C6-C7. (*Id.*). Claimant stated that she continued to have pain and numbness down her arm; that she was unable to work; that her condition was improved with her neck flexed forward, but that she otherwise continued to have symptoms; and that she had no other complaints. (*Id.*). Dr. Tao assessed Claimant with cervical radiculitis with protruding discs and slight right shoulder bursitis. (Tr. at 580). He repeated that he did not believe that her shoulder was the main problem and stated that he would recommend referral to a neurosurgeon if she wished to pursue that avenue, that he planned to keep her off work until she could see a neurosurgeon, and that she should continue with therapy and Naprosyn. (*Id.*).

On November 1, 2004, Claimant stated to Dr. Tao that traction was improving her symptoms in her right arm and that she had slight pain relief. (Tr. at 577). Her neck showed continued stiffness with positive Spurling's maneuver, the shoulder exam showed no pain even with resistance, and her radial pulse was intact. (*Id.*). His impression was cervical radiculitis with protruding disc. (Tr. at 578). He requested authorization for a neurosurgery referral to evaluate and treat her cervical problem and planned to keep her off work until she was seen by a neurosurgeon. (*Id.*). Dr. Tao believed that her shoulder was at maximum medical improvement with no significant pathology. (*Id.*).

On November 29, 2004, Claimant reported to Dr. Tao that her shoulder was still feeling "pretty good." (Tr. at 590). Dr. Tao noted that most of Claimant's complaints were of neck pain, which radiated into her arm with numbness and tingling. (*Id.*). She stated that there were no relieving factors. (*Id.*). Her neck showed continued stiffness with positive Spurling maneuver, but her shoulder exam was again benign with full painless motion. (*Id.*). Dr. Tao assessed Claimant with cervical radiculitis with a

protruding disc at C6-7 and planned to refer her to a neurosurgeon and to keep her off work for two months. (Tr. at 590-591).

On December 14, 2004, Doug James, PT, OCS, released Claimant from physical therapy. (Tr. at 536). Mr. James indicated that Claimant cancelled her November 11, 2004 appointment due to illness and did not keep her subsequent appointment or reschedule; after two unsuccessful attempts to reach her and her failure to return messages, Mr. James felt discharge was appropriate. (*Id.*). Mr. James documented that during Claimant's final session, she stated that she did her home exercise program often and that she had no complaints of neck or lower back pain. (Tr. at 536). She complained of right anterior shoulder pain at an intensity of 6/10 at rest, but the pain was abolished with repeated cervical retraction exercises and proper postural positioning of her head over her shoulders, which also alleviated the pain she experienced with right shoulder flexion and abduction. (*Id.*). She was advised to continue practicing better postural habits to facilitate the healing of her neck injury. (*Id.*).

On December 21, 2004, Dr. Tao referred Claimant to Panos Ignatiadis, M.D. (Tr. at 533). Dr. Ignatiadis found it unusual that Claimant reported that "nothing" had really alleviated her neck and shoulder pain, despite being on Lorcet 10 mg, which Dr. Ignatiadis deemed "a considerable amount of medication." (*Id.*). Dr. Ignatiadis reviewed her MRI and concluded that her bone integrity was excellent as there was no evidence of disc herniation or stenosis and she had minimal disc protrusion, which was considered normal for a 46 year old. (*Id.*). Dr. Ignatiadis stated that, in essence, Claimant's injury was not overwhelming, without any fracture or evidence of neurological findings on examination and no evidence of radiological findings to suggest necessity for surgical intervention. (Tr. at 534). He recommended that she undergo a functional capacity

- 14 -

evaluation to see where she stood from an employability standpoint. (*Id.*). He did not feel that her medications should be graduated. (*Id.*).

On January 18, 2005, Dr. Tao noted that Claimant was seen by a neurosurgeon, Dr. Ignatiadis, who did not believe that she needed surgery on her neck. (Tr. at 574). Claimant complained to Dr. Tao that her shoulder continued to bother her and was worse with activity and better with rest. (*Id.*). She also continued to complain of numbness and tingling down both arms. (*Id.*).   Dr. Tao's examination of Claimant's right shoulder was normal. (*Id.*). He "did not see an operative indication for her right shoulder" and stated that he "would just send her for some therapy and exercises." (Tr. at 575).

On January 21, 2005, Claimant saw Denise Clay, M.D for the first time. (Tr. at 241). Dr. Clay noted that she was unsure why Claimant came to her, considering that Claimant already had a primary care physician, Dr. Dawson, and saw Dr. Sommerville "at the walk-in clinic," noting that Claimant did not want to make appointments; she preferred to simply to "walk in." (*Id.*). Dr. Clay noted that Claimant had a history of irritable bowel syndrome and now had complaints of diarrhea lasting for the last three weeks, that she had a history of migraines, and that she had a history of health care non-compliance, with a habit of consulting multiple doctors for the same problems.  Dr. Clay observed that Claimant was seeing Dr. Dawson to obtain narcotics for her knee and shoulder strain, but was being followed by Dr. Tao for those problems. (Tr. at 242).

On January 27, 2005, Claimant continued to complain to Dr. Tao of numbness, tingling, and pain down into her hand. (Tr. at 572). She stated that the exercises were not really helping her, that it was hard to determine which fingers went numb, and that it woke her up at night. (*Id.*). He assessed her with right chronic neck pain, which was

- 15 -

stable; a normal right shoulder examination; and carpel tunnel syndrome on the right. (*Id.*). He reiterated that he did not believe that she had a primary shoulder problem, requested authorization for a nerve conduction study to assess her right upper extremity numbness and tingling, and planned to provide her with a resting night splint for her right wrist. (Tr. at 573).

On February 21, 2005, Deborah H. Gillispie, M.D., completed an independent medical examination of Claimant in reference to her Workers' Compensation claim. (Tr. at 204). Dr. Gillispie opined in her report, dated February 24, 2005, that based upon Claimant's medical history, physical examination, and radiographic studies, she sustained a contusion to the right knee and a sprain/strain to the neck and right shoulder on June 30, 2004. (Tr. at 207). Nonetheless, Dr. Gillispie stated:

> The claimant was initially treated conservatively by her primary care physician for her symptoms. The symptoms related to the knee essentially resolved. The claimant has had progressive symptoms in the cervical spine consistent with a radiculopathy. However, there are no radiographic studies to substantiate a correlation. The claimant's physical examination also does not correlate with her symptoms.

(*Id.*).

On March 15, 2005, Manjula Narayan, M.D., performed an EMG of Claimant's right upper extremity at the request of Dr. Tao to rule out carpel tunnel syndrome and radiculopathy. (Tr. at 544). There were unremarkable findings in the right upper extremity muscles. (*Id.*). Dr. Narayan's impression was that Claimant had carpel tunnel syndrome on the right which was mild to moderate and that there was no electrodiagnostic evidence of cervical radiculopathy. (*Id.*).

On April 5, 2005, Claimant presented to Dr. Tao's office complaining of neck, right shoulder, and wrist pain. (Tr. at 569). Claimant reported that she was using braces,

which helped somewhat at night, but she continued to have pain, numbness, and tingling down her arm and neck pain with referral into her shoulder. (*Id.*). Dr. Tao noted that her EMGs confirmed mild to moderate carpel tunnel syndrome with no cervical radiculopathy. (*Id.*). On examination, her right shoulder was "normal," her right wrist "showed positive Tinel's and compression signs at the wrist, but no atrophy was noted and her radial pulse was intact. (*Id.*). Dr. Tao assessed Claimant with right carpel tunnel syndrome and discussed the treatment options; Claimant expressed that she would like to have surgery. (Tr. at 570).

On May 19, 2005, Steve Martin, OTR/L (Occupational Therapist Registered/Licensed) completed a functional capacity evaluation on behalf of Workers Choice Health Services, Inc. (Tr. at 197-198). Mr. Martin noted that Claimant was injured on June 30, 2004 and subsequently received six weeks of physical therapy interventions and medical consultations. (Tr. at 197). She tested at the sedentary physical demand characteristic (PDC) category, although given the fact that she was very pain focused during the evaluation, rating pain in her right shoulder and right posterior neck as a 10 on a scale of zero through 10, Mr. Martin opined that it was unlikely that she could tolerate even sedentary work for eight hours per day, five days per week. (*Id.*).   Mr. Martin suggested a treatment plan aimed at increasing her flexibility, strength, and overall functional levels to a point that would allow her to return to her job as a security guard. (Tr. at 198).

On January 25, 2006, Ahmet Ozturk, M.D., at Cabell Huntington Hospital Regional Pain Management Center, evaluated Claimant. (Tr. at 211). Claimant began crying halfway through the interview process, stating that her pain was so intense. (*Id.*). She reported that her pain was located in her neck and radiated into her right shoulder

and fingers. (*Id.*).   She described her pain as "dull, aching, stabbing pain" that "goes away at times" when she is inactive. (*Id.*).   She stated that physical activity increased her pain and that her pain was constant until she took her medication and rested. (Tr. at 212). She reported that ice, electrical stimulation, and manipulations decreased her pain and her pain was mostly increased by driving and using her right arm to steer and also increased by coughing; waking up in the morning; when it was later in the evening and at night; sitting or riding in a car; and doing laundry, not at the time that she was doing it, but the next day. (*Id.*). She stated that her pain was usually an "8" out of 10 and was a "10" when most severe. (*Id.*).  Her daily activities consisted of watching television, light cooking, working on her computer, and walking around as much as she could; she was independent in daily grooming activities and could stand for one hour, sit for one hour, walk up to half a mile, and lift 20 pounds. (Tr. at 214).

On February 3, 2006, Dr. Ozturk followed up with Claimant. (Tr. at 216). He reviewed an x-ray of Claimant's cervical spine, indicating that she had slight effacement of facet contours, particularly at the right lower segments; her disc spaces were preserved; she had mild narrowing at C3 on the right only; and that her extension and flexion x-rays did not show any segmental abnormality. (*Id.*). Dr. Ozturk also reviewed an MRI of Claimant's cervical spine performed on September 27, 2004, noting that there were no significant bulges except for a minor bulge at C5-6, but that the MRI was otherwise negative. (*Id.*). Movement of Claimant's upper extremities was unrestricted and non-painful, but she had hypalgesia (diminished sensitivity to pain) and hypesthesia (diminished sensation) in the fourth and fifth digits of her right hand. (Tr. at 217). Dr. Ozturk's impression was that Claimant suffered from chronic pain syndrome; cervical facet syndrome on the right; and myofascial pain syndrome, which

was a strong component. (Tr. at 218).

On June 25, 2007, licensed psychologist Lisa C. Tate, M.A. evaluated Claimant for the West Virginia Disability Determination Service (hereinafter "DDS"). (Tr. at 293-298). Claimant reported feeling consistently nervous and depressed over the past three years since she became unable to work characterized by excessive worrying, crying, social withdrawal, loss of interest in activities, and feelings of hopelessness and helplessness. (Tr. at 294). On this basis, Ms. Tate diagnosed Claimant with major depressive disorder with anxious features. (*Id.*). On a Wechsler Adult Intelligence Scale-Third Edition, Claimant received a verbal IQ score of 79, a performance IQ score of 92, and a full scale IQ score of 84. (Tr. at 296). She was assessed as reading at the fourth grade level and spelling at the third grade level on a WRAT-3 test. (*Id.*).  Ms. Tate diagnosed Claimant with a learning disorder, NOS, spelling and reading disorder, based on the discrepancy between her intellectual functioning and her performance on the WRAT-3 test. (Tr. at 297). Claimant self-reported daily activities consisted of watching television, taking a shower, using the computer to review her checking account once a day, and playing video games twice per week; on a weekly basis, she did laundry, went to her grandson's sporting events, visited her son's home, and sat on her porch; she dusted, went to the drug store, and went to the grocery store once per month. (*Id.*).

On June 29, 2007, Drew C. Apgar, D.O., examined Claimant for the West Virginia Department of Education and the Arts Disability Determination Section. (Tr. at 275-292). His impression was that she suffered from (1) chronic pain syndrome with a history of trauma, including pain of the cervical and lumbar spine, shoulders and joints; headaches; and carpel tunnel syndrome; (2) chronic tobacco use and dependence; (3) depression, anxiety, and gastroesophageal reflux disease by history; and (4) morbid

obesity. Dr. Apgar noted that Claimant's grasp was diminished in her dominant right hand, but that her fine coordination, pinch, and manipulation were intact bilaterally; she was able to perform rapid alternating hand movements without difficulty; and that stereognosis (ability to perceive the form of an object by using the sense of touch) was present. (Tr. at 286). Claimant range of motion was restricted in her cervical spine, shoulders, and wrists, but no joint abnormalities were observed or palpated. (*Id.*). Claimant reported feeling depressed since the onset of her disability, but was friendly, cooperative, and forthcoming during her evaluation. (*Id.*). Further, her interests were not constricted, she demonstrated awareness of world events, she did not display concern for maintaining her current relationships, and she demonstrated good hygiene and effort toward appropriate personal appearance. (*Id.*). Dr. Apgar stated that based on objective findings, Claimant would have no difficulty standing, walking, sitting, hearing, speaking, and traveling and she might have marked difficulty lifting, carrying, pushing, pulling, and handling objects with her dominant hand. (Tr. at 287). However, Dr. Apgar found Claimant's effort to be unsatisfactory and viewed the results of the testing as possibly suspect. (*Id.*).

On July 12, 2007, James W. Bartee, Ph.D., completed a psychiatric review technique, finding that Claimant had a learning disorder, NOS/reading disorder, NOS, based on his June 2007 WAIS-III and WRAT-3 scores, as well as major depressive disorder with anxious features, based on his June 2007 psychological evaluation. (Tr. at 305 and 307). On a scale of "none," "mild," "moderate," "marked," and "extreme," Dr. Bartee found Claimant mildly restricted in activities of daily living and maintaining social functioning and moderately restricted in maintaining concentration, persistence, or pace. (Tr. at 314). Claimant had no episodes of decompensation of extended duration.

(*Id.*). Dr. Bartee found that Claimant's allegations were in general accord with the medical evidence of record and seemed largely credible. (Tr. at 316). On the same date, Dr. Bartee completed a mental RFC assessment, concluding that Claimant had "a number of mild to moderate reductions across the functional and adaptive domains," but that her limitations did "not currently meet or equal any of the listings." (Tr. at 302). She appeared "to retain sufficient mental capacity to perform simple 1-2 step routine and repetitive work-like activities in a low demand/pressure setting with limited expectations for social interactions with coworkers, supervisors or the general public. (*Id.*). This evaluation was later reviewed and affirmed by Timothy Saar, Ph.D. (Tr. at 341).

On July 23, 2007, DDS physician Porfirio Pascasio, M.D., completed a physical RFC assessment, noting the following:

- Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit with normal breaks for about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry.

- Claimant could occasionally climb ramps/stairs, balance, stoop, crouch, and crawl, but could never climb a ladder/rope/scaffold or kneel.
- Claimant was limited in reaching in all directions due to decreased range of motion of her right shoulder, but was unlimited in handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors).

- Claimant had no visual or communicative limitations.

- Claimant should avoid concentrated exposure to extreme cold, extreme heat, and hazards, but had no limitation regarding wetness, humidity, noise, vibration, and fumes/odors/gases.

(Tr. at 320-323). However, Dr. Pascasio found that the medical evidence did not support some of Claimant's allegations and, therefore, she was only partially credible. (Tr. at 324). Dr. Pascasio indicated that there was no treating or examining source statement

in the file. (Tr. at 325).

On December 4, 2007, DDS physician Marcel Lambrechts, M.D., completed a physical RFC assessment, finding the following:

- Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit with normal breaks for about 6 hours in an 8-hour workday; and push and/or pull an unlimited amount, other than as shown for lift and/or carry.

- Claimant could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but could never climb a ladder/rope/scaffold.

- Claimant was limited in reaching in all directions due to decreased range of motion of her right shoulder and in handling (gross manipulation), but was unlimited in fingering (fine manipulation) and feeling (skin receptors).

- Claimant had no visual or communicative limitations.

- Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, but had no limitation regarding wetness, humidity, noise, and fumes/odors/gases.

(Tr. at 334-337). In sum, Dr. Lambrechts noted the same exertional limitations as Dr. Pascasio, but found less restrictive postural limitations, finding that Claimant could occasionally kneel, as opposed to Dr. Pascasio's assessment that Claimant could never do so; an additional manipulative restriction, concluding that Claimant was limited in handling (gross manipulation) due to a moderate impairment of decreased range of motion of her right shoulder and decreased grip in her right hand; and added an environmental limitation, noting that Claimant should avoid concentrated exposure to vibration. (*Id.*). Dr. Lambrechts assessed that Claimant's symptoms appeared partly credible and supported by findings based on the following: She was obese and some of her symptoms appeared to be related to her obesity with a body mass index of 37; she had mild to moderate carpel tunnel syndrome in her right hand and decreased range of

motion in her right shoulder, her flexion estimated at 90 degrees; however, in checking her range of motion, the examiner felt that she was not making her best effort; and she also suffered from gastroesophageal reflux disease. (Tr. at 338). Therefore, Dr. Lambrechts reduced her RFC as noted above. (*Id.*). There was not a treating or examining source statement in the file. (Tr. at 339).

On January 7, 2008, Claimant consulted with Terrence W. Triplett, M.D. for the first time, presenting three concerns. (Tr. at 354). Claimant primarily complained of right arm pain that existed since 2003 and for which she was followed by Dr. Dawson who prescribed her 10 mg of Percocet, taken twice during the night, and 10 mg of Lortab taken up to four to six times per day. (*Id.*). She also complained of lower back discomfort, which she stated that she had "on and off" for years, but was exacerbated by a slip injury around Christmas. (*Id.*). She reported that if she stood for more than 20 or 30 minutes or rolled onto her back at night, both of the anterior surfaces of her upper and lower extremities would become numb. (*Id.*). Her third complaint concerned her sinuses, reportedly caused by seasonal allergies. (*Id.*). Her medications, otherwise, included, 2 mg of Valium taken every two or three days, just as needed for her "nerves." (*Id.*). On examination, Claimant showed a limited range of motion in all directions, especially in the right upper extremity, and her grip strength was 2/5 on the right versus 4/5 on the left. (Tr. at 355). Dr. Triplett ordered an MRI of Claimant's lumbar spine to rule out spinal stenosis due to her lower extremity paresthesias, as well as full blood panels. (Tr. at 355-356).

On January 15, 2008, Dr. Triplett advised Claimant that her MRI results and all of her blood work were normal. (Tr. at 353). She stated that she was still having issues so Dr. Triplett ordered EMGs on her bilateral lower extremities. (*Id.*). There were

otherwise no concerns. (*Id.*).

On March 7, 2008, Claimant was referred to Suresh Kumar, M.D., complaining of numbness in her anterior lateral thigh region that she experienced "for the past couple of months." (Tr. at 352). Nerve conduction studies performed on both lower extremities were within normal limits. (*Id.*). Dr. Kumar found no evidence of neuropathy, but planned to reschedule a complete needle exam to rule out radiculopathy. (*Id.*). The needle exam was aborted because Claimant suddenly complained of being unable to move her right leg from the knee down and started crying. (Tr. at 351). At that point, she had good feeling in her leg in all modalities and was able to lift her knee up, but unable to move anything from the knee down; her plantars were downgoing and reflexes were symmetrical. (*Id.*). After sitting for some time, she was somewhat able to move her foot, as well as stand and walk without assistance. (*Id.*).  Dr. Kumar advised her that she needed to be admitted to the hospital for evaluation, but she decided to return home, rest, and see if the problem resolved. (*Id.*).

On March 19, 2008, Dr. Triplett followed up with Claimant regarding her complaints of paresthesias of her lower extremities. (Tr. at 461). He reported that the EMG, MRI, and MRA of her brain and neck arterial structures we all negative. (*Id.*). She had not experienced any further "spells;" thus, Dr. Triplett deferred further workup to Dr. Kumar. (*Id.*).

On March 26, 2008, Dr. Kumar completed the needle examination which was originally scheduled for March 7, 2008, but was aborted because of Claimant's discomfort. (Tr. at 460). The examination of Claimant right lower extremity, including her lumbar paraspinals, did not reveal any abnormalities. (*Id.*). It was deemed a normal study;  there was no evidence of any neuropathy or right lumbosacral radiculopathy

from Claimant's symptoms. (*Id.*).  Dr. Kumar surmised that it appeared that Claimant had meralgia paresthetica. (*Id.*).

On March 31, 2008, Dr. Triplett noted that Claimant was seen by Dr. Kumar and "had multiple testing for her vague complaints of bilateral lower extremity paresthesias," including multiple radiographic, MRI, and lab studies, all of which were normal. (Tr. at 459). She continued to express subjective complaints of paresthesias and Dr. Triplett had a "long frank discussion" with her about the limitations of family practice as well as local neurology that could not give her an answer. (*Id.*). He referred her to the Cleveland Clinic. (*Id.*).

On May 22, 2008, Claimant returned to Dr. Triplett, relating that she had an acute flare up of chronic pain. (Tr. at 467). She typically saw Dr. Dawson who prescribed her Percocet and Lortab for this issue, but insisted that "this [was] different;" it was "more confined on her right side" and hurt when she moved. (*Id.*).  It began three days prior and she stated that she was barely able to walk the day before. (*Id.*).  She did not have numbness or tingling of her extremities and had no other concerns. (*Id.*).  Her range of motion was limited extensively due to pain. (*Id.*). Dr. Triplett assessed that Claimant had acute chronic low back pain. (*Id.*).

On January 29, 2009, Dr. Dawson completed a standard form Medical Assessment of Ability to do Work-Related Activities (Physical). (Tr. at 646). Dr. Dawson found that Claimant could occasionally and frequently lift a maximum of two pounds; that in a 8-hour workday, she could stand/walk or sit for a total of 15 minutes and do so for only 5 minutes without interruption; that she could never climb, balance, stoop, crouch, kneel, or crawl; that she was prevented from reaching, handling, feeling, and pushing/pulling due to poor grip strength, numbness, and chronic pain; and that she

was restricted in negotiating heights and moving machinery due to weakness in her hands, shoulder, and knee, that temperature extremes, humidity, and vibration exacerbated her chronic pain, and that fumes caused extreme headaches. (Tr. at 646-648).

## VI.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant's presents three challenges to the Commissioner's decision. First, Claimant argues that the ALJ underappreciated the effects of her impairments and pain on her ability to perform work-related functions. Specifically, Claimant contends that the ALJ (1) disregarded the numbness in Claimant's hands and loss of grip strength, allegedly causing her to drop items from her grasp; (2) improperly assessed Claimant's credibility; (3) dismissed evidence of Claimant's severe, chronic pain; (4) failed to consider the effects of Claimant's impairments in combination; and (5) disregarded the medical records, such as a Functional Capacity Evaluation performed at the request of Brickstreet, the insurance provider for Claimant's employer. (Pl.'s Br. at 9-13). Second, Claimant argues that the ALJ improperly disregarded her treating doctor's opinion. (*Id.* at 14-15). Third, Claimant asserts that the ALJ failed to present sufficient evidence to "rebut the presumption of disability." (*Id.* at 15-16).

In response, the Commissioner argues that the ALJ considered all of Claimant's impairments, separately and in combination, in determining Claimant's functional restrictions. Furthermore, the Commissioner contends that the ALJ's RFC assessment accounted for each of Claimant's established limitations, and the ALJ followed the appropriate process in assessing Claimant's credibility. According to the Commissioner, the ALJ adequately developed the record and properly evaluated the opinion evidence; therefore, substantial evidence supports the ALJ's decision that Claimant was not

disabled.  (Def.'s Br. at 10-19).

Having thoroughly considered the evidence and the arguments of counsel, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## VII.   <u>Analysis</u>

### A. The Effects of Claimant's Impairments

Claimant posits that the ALJ disregarded the effects of her degenerative joint disease, depression, carpel tunnel syndrome, acid reflux, and headaches on her ability to function. (Pl.'s Br. at 9). In particular, Claimant asserts that the ALJ ignored the impact that the numbness in her hands and loss of grip strength, which caused her to drop items from her grasp, would have on the number of jobs, such as "reducing or eliminating, cleaner, routing clerk, grader/sorter, and assembler." (*Id.*).

Contrary to Claimant's assertion, the ALJ explicitly considered the effects of each of these impairments on Claimant's ability to function.  At the second step of his analysis, the ALJ thoroughly discussed Claimant's degenerative joint disease, depression, carpel tunnel syndrome, headaches, and acid reflux, considering and articulating Claimant's subjective complaints, the medical evidence, and how the conditions affected her ability to engage in basic work activities and complete activities of daily life. (Tr. at 11-13, Finding No. 3). Ultimately, the ALJ concluded that only Claimant's degenerative joint disease and depression were considered "severe" impairments, documenting the evidence upon which that he relied in making those determinations. (Tr. at 11-12).  The ALJ also thoroughly discussed Claimant's carpel tunnel syndrome, headaches, and acid reflux, explaining his reasoning for finding that the impairments were not severe. In brief, the ALJ commented that Claimant's carpel

tunnel syndrome was treated minimally and that her brace and pain medication kept the condition under control; that Claimant never mentioned suffering from headaches or acid reflux in her testimony; that the conditions were mentioned minimally throughout the record; and that Claimant's headache medication Imitrex and the acid reflux medication Nexium treated the symptoms of these conditions. (Tr. at 12-13).

Although Claimant broadly argues that the ALJ failed to consider the effects of her impairments, the only actual "effects" that she states in support of her assertion that the ALJ disregarded the effects of the above impairments is that the ALJ dismissed Claimant's supposed "numbness in her hands and loss of grip strength." (Pl.'s Br. at 9). However, the ALJ clearly incorporated these limitations into his RFC finding, stating that Claimant could perform light work with additional exertional restrictions that she could "never climb ladders," was "limited to only occasionally reaching overhead," could engage in "no constant use of her right hand for strong grip," and was "to eliminate subjecting herself to heights or dangerous machinery." (Tr. at 15, Finding No. 5). This finding is reflective of the extent of Claimant's limitations as supported by the record.

Although the medical evidence documents impaired grip strength and numbness in Claimant's right hand, it does not indicate that the conditions posed more restrictive functional limitations than those noted by the ALJ in his RFC. There are very few objective findings to corroborate Claimant's subjective complaints. Rather, the weight of the medical evidence supports the ALJ's RFC assessment. For instance, on June 29, 2007, Dr. Apgar noted that Claimant's grasp was diminished in her dominant right hand, but that her fine coordination, pinch, and manipulation were intact bilaterally; she was able to perform rapid alternating hand movements without difficulty; and stereognosis (ability to perceive the form of an object by using the sense of touch) was

present. (Tr. at 286). He stated that she might have marked difficulty lifting, carrying, pushing, pulling, and handling objects with her dominant hand; however, he found Claimant's effort to be unsatisfactory and viewed the results of the testing as possibly suspect. (Tr. at 287).  On July 23, 2007, Dr. Pascasio found that Claimant was unlimited in handling (gross manipulation) and fingering (fine manipulation). (Tr. at 322). He found that some of Claimant's allegations were unsupported by the medical evidence and that she was only partially credible. (Tr. at 324). On December 4, 2007, Dr. Lambrechts added that Claimant was limited in handling (gross manipulation) due in part to moderate decreased grip in her right hand; however, he agreed that Claimant symptoms appeared only partially credible. (Tr. at 336 and 338). On January 7, 2008, Claimant reported to Dr. Triplett that if she stood for more than 20 or 30 minutes or rolled onto her back at night, that her extremities would become numb; also, her grip strength was measured as 2/5 on the right and 4/5 on the left. (Tr. at 354). Yet, Dr. Triplett did not order any tests or note any concerns regarding Claimant's upper extremities, whereas he did express concern regarding Claimant's lower extremities, ordering a MRI of Claimant's lumbar spine, full blood panels, and EMGs to assess her alleged lower extremity paresthesias, the results of which were all normal. (*See* Tr. at 353, 352, 460, and 461). Furthermore, during her meeting with Dr. Triplett on May 22, 2008, Claimant reported that she did not have numbness or tingling of her extremities. (Tr. at 467).

The only recent objective evidence which substantiates a more severe restriction than those noted by the ALJ in this regard is Dr. Dawson's January 29, 2009 finding that Claimant was prevented from reaching, handling, feeling, and pushing/pulling due to poor grip strength and numbness. (Tr. at 648). However, as discussed in Section B

*infra*, Dr. Dawson's opinions were determined to be inconsistent with the record as a whole. Therefore, based on the above, the Court finds that the ALJ's consideration of Claimant's grip strength and hand numbness is supported by substantial evidence.

Further, the ALJ addressed a hypothetical to a vocational expert during the administrative hearing mirroring the limitations reflected in his RFC finding. The expert responded that a person with the limitations listed, including someone who could "never climb ladders," was "limited to only occasional reaching overhead," and could engage in "no constant use of the right hand for strong grip," could perform jobs such as grader/sorter and assembler.[4] The Court finds that the ALJ's RFC finding properly reflected the extent of Claimant's handgrip and numbness; therefore, Claimant is incorrect that these conditions would reduce or eliminate her ability to perform employment positions such as grader/sorter and assembler, as evidenced by the vocational expert's testimony.

In a related vein, Claimant argues that the ALJ "disregarded the effects of her severe chronic pain on her ability to concentrate and maintain persistence and pace," which she claims would have a devastating effect on her ability to obtain gainful employment, such as that of an assembler or grader/sorter. (Pl.'s Br. at 9). Claimant alleges that in evaluating whether her allegations of pain were credible, the ALJ made broad generalizations without mentioning specific traits which informed his Decision and he disregarded testimony and medical records indicating her constant pain and the severe effect of her pain on her daily activities. (*Id.*).

---

[4] It is unclear why Claimant argues that her limited grip strength and hand numbness would reduce or eliminate her ability to perform the position of "cleaner" as it was not cited as a job that Claimant could perform despite her impairments.

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, pursuant to 20 C.F.R. §§ 404.1529 and 416.929, in order to determine their limiting effects on a claimant.  First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain.  SSR 96-7P.  Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities.  *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record.  *Id.*

In this case, the ALJ accepted that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms; thus, the ALJ evaluated the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they prevented her from working. The ALJ found that Claimant's statements concerning the intensity, persistence, and severity of her symptoms were exaggerated and not credible to the extent that they were inconsistent with the ALJ's RFC assessment. (Tr. at 17-18, Finding No. 5). The ALJ cited to specific pieces of evidence contained in the record that caused the ALJ to question Claimant's credibility. For example, Claimant stated that she could walk no more than one to two

blocks, stand for only five minutes, lift only three pounds, and sit for only one minute without being in pain; however, Dr. Ozturk opined in January 2006 that Claimant could stand for one hour, sit for one hour, walk up to half of a mile, and lift twenty pounds. (Tr. at 17, Finding No. 5). Claimant also claimed that she was unable to concentrate; yet she played video games, handled money, balanced a checkbook, and paid bills, among other activities. (*Id.*). Further, she ceased attending her physical therapy appointments without explanation and was involuntarily discharged as a patient.  Likewise, Dr. Clay noted in 2005 that Claimant had a history of non-compliance with scheduled appointments and that she saw multiple doctors for the same problems often receiving medications, which the ALJ reasonably regarded as evidence of narcotics shopping. (Tr. at 17-18, Finding No. 5).

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner."  *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990).  Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulation, case law, and Social Security Rulings and was supported by substantial evidence. 20 C.F.R. §§ 404.1529 and 416.929; SSR 96-7p, 1996

WL 374186 (July 2, 1996); *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Significant evidence existed in the record that Claimant's complaints of pain did not correlate with her level of activity and functional abilities. In addition to the records cited by the ALJ, Dr. Tao noted in 2004 that he found it unusual that Claimant reported that "nothing" really alleviated her neck and shoulder pain despite taking Lorcet, 10 milligrams, "a considerable amount of medication." (Tr. at 533). In 2005, Dr. Gillispie similarly observed that Claimant's symptoms related to her knee had essentially resolved and that, although she complained of progressive symptoms in her cervical spine consistent with a radiculopathy, the radiographic findings and her physical examination did not substantiate a correlation. (Tr. at 207). In 2006, Claimant reported to Dr. Ozturk that her pain was usually an "8" out of "10" and a "10" when most severe, yet on a daily basis, she cooked for herself, worked on her computer, walked around as much as she could, independently groomed herself, and stated that she could stand for one hour, sit for one hour, walk up to half of a mile, and lift 20 pounds. (Tr. at 214). In 2007, Claimant stated that she was able to do laundry, attend her grandson's sporting events, visit her son's home, dust, and go to the drug store and grocery store on a weekly basis. (Tr. at 297).

In addition to the disparity between Claimant's allegations of severe pain and associated limitations, on the one hand, and her documented ability to engage in a variety of routine activities, on the other hand, multiple doctors doubted Claimant's credibility. In 2007, Dr. Apgar found that Claimant exhibited unsatisfactory effort during testing and noted that he considered the results of the tests to be suspect. (Tr. at 287). Later in 2007, Dr. Pascasio determined that the medical evidence did not support some of Claimant's allegations and that she was only partially credible. (Tr. at 324). Dr. Lambrechts assessed that Claimant was only partly credible, noting that she failed to

make her best effort during the range of motion test. (Tr. at 338). In 2008, Dr. Triplett had a "long frank discussion" with Claimant, advising her that multiple radiographic, MRI, and lab studies failed to substantiate or explain her subjective complaints of bilateral lower extremity paresthesias and encouraged her to seek another medical provider concerning the issue. (Tr. at 459). Therefore, the ALJ's assessment of Claimant's credibility was supported by substantial evidence.

Claimant next argues that the ALJ failed to consider her impairments in combination, ignoring evidence that any use of her arms and hands exacerbated her carpel tunnel syndrome and her severe pain caused by her degenerative joint disease exacerbated her depression, causing her to avoid interaction with others. (Pl.'s Br. at 13-14). Undoubtedly, the ALJ was required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).   As the Fourth Circuit Court of Appeals stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity."   *Walker v. Bowen, supra* at 50.

Here, the ALJ fulfilled his obligation to evaluate Claimant's impairments, separately and in combination, specifically addressing how they affected Claimant's functional capacity. Contrary to Claimant's allegation, the ALJ explicitly considered the interplay between Claimant's pain and depression, noting that Claimant resisted interacting with people because she was in pain; ultimately, concluding that Claimant's depression was a severe impairment and reducing the RFC finding accordingly, limiting

her to a low pressure setting with limited social interaction. (Tr. at 12 and 15). The ALJ considered the effects that Claimant's depression had on her ability to function, including evidence that her immediate memory, social functioning, and persistence and pace were within normal limits, although her remote memory and concentration was moderately deficient. (Tr. at 16-17). In addition, the ALJ thoroughly considered Claimant's pain not only as it related to her carpel tunnel syndrome, but also to her other impairments. As discussed above, Claimant's complaints of pain were not fully credible and therefore treated accordingly. As noted by the ALJ, treatment for Claimant's carpel tunnel syndrome was minimal and the condition is controlled by the use of a brace and pain medication. (Tr. at 12). Claimant's argument that the ALJ failed to consider the synergistic effect of her impairments clearly is without merit.

Lastly, Claimant argues that the ALJ improperly "went so far as to disregard the Functional Capacity Evaluation performed by Brickstreet, the unemployment insurance provider for Toyota, where [Claimant] was employed and injured," which assessed her functional capabilities at less than sedentary. (Pl.'s Br. at 12). Claimant implies that this report bolsters her credibility regarding the persistence, intensity, and limiting effects of her symptoms. However, Claimant's attempt to highlight a single, inconsistent record to support her claims is misguided. As the ALJ aptly indicated, the Functional Capacity Evaluation ordered by Brickstreet was performed by Steve Martin, an occupational therapist, (Tr. at 197-203), and rested primarily on Claimant's subjective complaints, which were deemed exaggerated by various physicians.  As such, his report was not supported by objective findings or the weight of the record.[5]  For example, Dr. Apgar stated that Claimant would have no difficulty standing, walking, or sitting and both Dr.

---

[5] The ALJ rejected Dr. Dawson's opinion for the same reason. (Tr. at 19).

Pascasio and Dr. Lambrechts rated Claimant at the light exertional level. (Tr. at 287, 320, and 334). Moreover, the Court notes that the three mentioned physicians are all considered "acceptable medical sources," whose opinions are given great weight on the issue of functional capacity than an occupational therapist, who is considered an "other source" and whose opinions, consequently, are afforded less weight. SSR 06-03p.

### B. Treating Physician's Opinion

Claimant next contends that the ALJ erred in dismissing Dr. Dawson's Medical Assessment of Ability to do Work-Related Activities in favor of the agency physicians. (Pl.'s Br. at 14). In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. § 404.1527(d)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence."  *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2).  Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and resolve conflicts of evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Court need only review the record as a whole and corroborate that the Commissioner's conclusions are rational and based upon substantial evidence.

Dr. Dawson found that Claimant could occasionally and frequently lift a maximum of two pounds; that in a 8-hour workday, she could stand/walk or sit for a

total of 15 minutes and do so for only 5 minutes without interruption; that she could never climb, balance, stoop, crouch, kneel, or crawl; that she was prevented from reaching, handling, feeling, and pushing/pulling due to poor grip strength, numbness, and chronic pain; and that she was restricted in negotiating heights and moving machinery due to weakness in her hands, shoulder, and knee, that temperature extremes, humidity, and vibration exacerbated her chronic pain, and that fumes caused extreme headaches. (Tr. at 646-648). However, Dr. Dawson's treatment notes contain very little explanation for her opinions.  Other than reiterating Claimant's subjective complaints, Dr. Dawson's records reflect minimal medical investigation. In addition, her opinions strongly conflict with the weight of the remaining objective medical evidence.

Claimant suggests that she became unable to work due to a work injury on June 30, 2004. However, following her injury, Dr. Sommerville treated her conservatively, only suggesting that she take Advil, ice the affected areas, and take off work until she returned for reevaluation in five days. (Tr. at 247). Subsequent examinations by Dr. Lewis, Dr. Hegg, and Dr. Tao revealed no cause for her chronic complaints of pain.  She was repeatedly told that she merely needed time, physical therapy, and medication. (Tr. at 246, 602, 597, and 586). As Claimant continued to complain of pain, she was referred to a neurosurgeon who found that her injury was not overwhelming and did not necessitate surgical intervention. (Tr. at 534). The following year, an independent medical examiner determined that Claimant's symptoms related to her knee had essentially resolved and that studies failed to corroborate her complaints of symptoms consistent with cervical spine radiculopathy. (Tr. at 207). In 2006, Dr. Ozturk found that movement of Claimant's upper extremities was unrestricted and non-painful. (Tr. at 217).

Moreover, in 2007, Dr. Apgar explicitly found that *based on objective findings*, Claimant should have no difficulty standing, walking, or sitting, and that her possible marked difficulty lifting, carrying, pushing, pulling, and handling objects with her dominant hand was suspect because of her unsatisfactory effort. (Tr. at 287). The same year, Dr. Pascasio found that Claimant could perform light work with added nonexertional limitations that she could only occasionally climb ramps/stairs, balance, stoop, crouch, and crawl, but could never climb a ladder/rope/scaffold or kneel; that she was limited in reaching in all directions due to decreased range of motion of her right shoulder, but was unlimited in handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors); and that she should avoid concentrated exposure to extreme cold, extreme heat, and hazards. (Tr. at 320-323). Dr. Lambrechts made the same findings as Dr. Pascasio, except finding that Claimant could, in fact, occasionally kneel; that she was limited in handling (gross manipulation) due to a moderate impairment of decrased range of motion in her right shoulder and decreased grasp in her right hand; and that she should avoid concentration exposure to vibration. (Tr. at 334-337). In 2008, Claimant presented to Dr. Triplett, complaining of right arm pain, lower back discomfort, and sinus problems, yet results of her MRI, blood panels, and EMGs were all normal. (Tr. at 354-356, 352, and 460).

Therefore, as is evident from the medical evidence excerpted above, and in viewing the record as a whole, Dr. Dawson's 2009 findings as stated in her Assessment of Ability to do Work-Related Activities are entirely inconsistent with the other physicians' mutually supportive findings. Therefore, the ALJ's decision to discredit the opinions of Claimant's treating doctor, Dr. Dawson, was supported by substantial evidence.

### C.  Burden to Prove Disability

Claimant's final contention is that the ALJ did not carry his burden to rebut the "presumption of disability." The Court finds this contention to be equally without merit. Claimant is ultimately responsible for proving that she is disabled, and this responsibility never shifts to the Commissioner, but remains with Claimant.  As such, she bore the burden of providing medical evidence to the Commissioner that established the severity of her impairments.  20 C.F.R. §§ 404.1512(a) and 416.912(a). *See Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  While the Commissioner had a duty to go forward with the evidence at the fourth step of the evaluation, Claimant retained "the risk of non-persuasion."  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056 (4th Cir. 1976).

At the fourth step of the sequential disability evaluation, the SSA recognizes that when a claimant proves the existence of severe impairments, which prevent the performance of past relevant work, the claimant has established a *prima facie* case of disability.  The burden of production then shifts to the Commissioner to provide evidence demonstrating that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  20 C.F.R. §§404.1520(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an

alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569. However, the grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids merely provide a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the ALJ must prove the availability of jobs through the testimony of a vocational expert. *Id.* As a corollary to this requirement, however, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments. See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

In the present case, the ALJ recognized that Claimant's impairments resulted in a combination of exertional and nonexertional impairments. Therefore, he properly relied upon the testimony of a vocational expert in determining that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. at 39-

42).  Claimant makes no argument that the vocational expert was not qualified to render opinions, or that his opinions were based upon incomplete or inaccurate hypothetical questions.  Indeed, the vocational expert was present throughout the administrative hearing and had the opportunity to listen to Claimant's descriptions of her medical conditions and their resulting functional limitations.  Despite the totality of Claimant's restrictions, the vocational expert found light and sedentary exertional level positions that Claimant could perform. (Tr. at 41). Moreover, the vocational expert verified that his opinions were consistent with the Dictionary of Occupational Titles. (Tr. at 42).   In view of these circumstances, the Court finds that the ALJ fulfilled his obligation to produce expert testimony on the subject of job availability individualized to the Claimant.  Consequently, the decision of the Commissioner that Claimant was not under a disability is supported by substantial evidence.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  February 28, 2011.

Cheryl A.  Eifert
United States Magistrate Judge